04 44T

AO 243 (Rev. 5/85)

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District OF RHODE ISLAND | |
|---|---|---|
| Name of Movant ALBERT MONTEIRO | Prisoner No. 05071-070 | Case No. 01-00111-01T |
| Place of Confinement UNITED STATES PENITENTIARY, P.O. BOX 26030, BEAUMONT, TEXAS 77720-6030 | | |

UNITED STATES OF AMERICA V. ALBERT MONTEIRO (name under which convicted)

## MOTION

1. Name and location of court which entered the judgment of conviction under attack UNITED STATES DISTRICT COURT, FOR THE DISTRICT OF RHODE ISLAND.

2. Date of judgment of conviction JANUARY 11, 2002

3. Length of sentence 15 YEARS IMPRISONMENT

4. Nature of offense involved (all counts) COUNT ONE: FELON IN POSSESSION OF AN FIREARM, IN VIOLATION OF TITLE 18 U.S.C.&922(g)(1),AND&924(e).

5. What was your plea? (Check one)
   (a) Not guilty ☐
   (b) Guilty XX
   (c) Nolo contendere ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   N/A

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☐
   (b) Judge only ☐ N/A

7. Did you testify at the trial?
   Yes ☐ No XX

8. Did you appeal from the judgment of conviction?
   Yes XX No ☐



1

AO 243 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court UNITED STATES COURT OF APPEALS, FOR THE FIRST CIRCUIT.

(b) Result AFFIRMED.

(c) Date of result OCTOBER 24, 2002

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No XX

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court N/A

(2) Nature of proceeding N/A

(3) Grounds raised N/A

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐ N/A

(5) Result N/A

(6) Date of result N/A

(b) As to any second petition, application or motion give the same information:

(1) Name of court N/A

(2) Nature of proceeding N/A

(3) Grounds raised N/A

AO 243 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐ N/A

(5) Result N/A

(6) Date of result N/A

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc. Yes ☐ No ☐
(2) Second petition, etc. Yes ☐ No ☐ N/A

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

N/A

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.

AO 243 (Rev. 5/85)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: INEFFECTIVE ASSISANCE OF COUNSEL

Supporting FACTS (state *briefly* without citing cases or law) PETITIONER CONTENDS THAT COUNSEL FAILED TO OBJECT TO THE ILLEGAL ARREST OF PETITIONER AND COUNSEL FAILED TO OBJECT TO THE INVALID INDICTMENT BASED ON THE DOUBLE JEOPARDY CLAUSE FOR BEING A FELON IN POSSESSION OF A FIREARM.

B. Ground two: INEFFECTIVE ASSISTANCE OF COUNSEL

Supporting FACTS (state *briefly* without citing cases or law): PETITIONER CONTENDS THAT COUNSEL OF RECORD FAILED TO PROPERLY PREPARE FOR THE INCIDENT BECUASE COUNSEL OF RECORD FAILED TO INTERVIEW A EYE-WITNESS NAME VIVIAN LEE WHO COULD HAVE TESTIFIED THAT THE POLICE OFFICERS LIED IN THE INCIDENT CASE OF THEIR ILLEGAL WARRANTLESS SEARCH AND SEIZURE.

C. Ground three: INEFFECTIVE ASSISTANCE OF COUNSEL

Supporting FACTS (state *briefly* without citing cases or law): PETITIONER FURTHER CONTENDS THAT COUNSEL OF RECORD WAS CONSTITUTIONALLY INEFFECT-IVE WHEN HE FAILED TO CHALLENGE THE COURT'S LACK TO PROSECUTE PETITIONER BASED ON THE LEGAL PREMISE THAT THE GOVERNMENT DID NOT AND/OR HAD NOT ESTABLISHED THAT ANY PROPERTY NAMED IN THE

AO 243 (Rev. 5/85)

INDICTMENT CHARGED IN CASE NUMBER:01-00111-01T AND/OR CONTAINED WITHIN DISCOVERY MATERIAL CAME WITHIN FEDERAL CRIMINAL

D. Ground four: Whether the police officers in this case violated the petitioner's Fourth Amendment Right.

Supporting FACTS (state *briefly* without citing cases or law): Petitioner contends that the police officers in this incident case matter violated his Fourth Amendments right to be free from illegal search and seizure when officers Keith Lafazia, and, officer Greg Sion, illegally stop petitioner without probable cause to search petitioner. (See Exhibit "A" hereto this Petition).

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: Due to ineffective assistance of counsel petitioner was unable to bring these and other issues before the Honorable Court.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒XX

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing GEORGE J. WEST,ESQ., 1500 FINANCIAL PLAZA, PROVIDENCE, RI 02903

(b) At arraignment and plea SAME AS ABOVE

(c) At trial SAME AS ABOVE

(d) At sentencing SAME AS ABOVE

**GROUND THREE:**

**SUPPORTING FACTS CONTINUE:**

JURISDICTION UNDER THE ASSIMILATED CRIME ACT, AND , THAT THE STATUTE DID NOT REACH POSSESSION OF A FIREARM NOT SHOWN TO HAVE BEEN "IN OR AFFECTING COMMERCE", AND THAT, IF IT DID, CONGRESS HAD OVERSTEPPED IT'S CONSTITUTIONAL POWERS UNDER THE COMMERCE CLAUSE.

AO 243 (Rev. 5/85)

(e) On appeal GEORGE J. WEST, ESQ., 1500 FINANCIAL PLAZA, PROVIDENCE, RI 02903.

(f) In any post-conviction proceeding N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☐ No XX

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No XX

(a) If so, give name and location of court which imposed sentence to be served in the future: N/A

(b) Give date and length of the above sentence: N/A

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐ N/A

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

FEBURARY 6, 2004
(date)

Albert D. Monteiro
Signature of Movant

CERTIFICATE OF SERVICE

I, Albert Monteiro, certify that a ture a correct copy of the enclsed documents was sent to the following address:

**Dulce Donovan,Esq.**
**ASSISTANT U.S. ATTORNEY**
**50 Kennedy Plaza-8th Floor**

**Providence, Ri 02903**

Albert O. Monteiro
**ALBERT MONTEIRO**

---

E X H I B I T "A"

---

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

**IN THE MATTER OF:**

ALBERT MONTEIRO

Testimony of **OFFICER KEITH LAFAZIA** a Witness herein, heard before the **OCTOBER 2001-A TERM GRAND JURY** on **WEDNESDAY, NOVEMBER 7, 2001 9:38 A.M.**, in Room 314 of the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

**DULCE DONOVAN, ESQUIRE**
ASSISTANT U.S. ATTORNEY

Diane J. DeStefano, RPR
401 Gravelly Hill Road
Wakefield, Rhode Island 02879
(401) 782-4441

(COMMENCED AT 9:38 A.M.)

**OFFICER KEITH LAFAZIA,**

called as a witness and having

first been duly sworn, testifies as follows:

**EXAMINATION**

**BY MS. DONOVAN:**

Q. Please state your full name for the record.
A. Keith Lafazia, L-A-F-A-Z-I-A.
Q. By whom are you employed?
A. Providence Police.
Q. And in what capacity are you employed there?
A. Patrolman.
Q. How long have you been a patrolman with the Providence Police Department?
A. Approximately five years.
Q. Were you so employed on January 13th, 2001?
A. Yes.
Q. What shift were you working that day, do you recall?
A. Eleven in the morning until twelve at night.
Q. Do you have a partner that you work with?
A. Yes.
Q. Who is that?
A. Greg Sion.

Q. Where were you patrolling the evening of January 13th, 2001?

A. We were patrolling on Lockwood Plaza, south side of Providence.

Q. What is Lockwood Plaza, for members of the grand jury that might not know?

A. It's a housing development. We work all the housing developments in the city.

Q. In the course of your patrol of the Lockwood Plaza housing development, did you observe anything that caught your attention?

A. Yes.

Q. What did you observe?

A. We observed one male by himself. We didn't recognize him.

Q. And what about this individual caught your attention?

A. He had a bulge in the front of his pants sticking through to his waistband.

Q. Where were you when you were observing him?

A. Pretty much on the side of him. We were driving past him.

Q. So you were in your patrol car?

A. Yes.

Q. And was Patrolman Sion also in the car with you?

A. Yes, he was.

Q. Okay. And, again, please describe what you saw about this individual that caught your attention.

A. You could see a gun sticking from his waistband. He had a leather jacket on, but he had a pullover hoodie pushed behind it as though he tried to put it over but he didn't get it and he shoved it behind it by accident, and it was actually sticking forward. And the gun is pretty big. It's not like a gun you could conceal.

Q. Okay. What did you do once you observed the gun?

A. I dropped my partner off and I cut out in front of him to block him off. I figured the foot chase was on, and I wanted to get as close as I could to him.

Q. What happened next?

A. My alley light was on, which is a light that you illuminate people with, and I went by him and I could definitely see it was a gun. So I got out of the car in front of him and I yelled to my partner, "There's a gun." And we ran up to him, and as soon as I said "gun," the suspect immediately put his hand to his waistband right on the gun. So we grabbed it, we handcuffed him and took the gun out of

his pants.

Q. Do you know what kind of gun it was?

A. It's a Tech 9 assault gun.

Q. How do you know what kind of gun it was?

A. I have one at home.

Q. Did you actually seize the gun?

A. Yes, I did.

Q. As opposed to your partner?

A. Yes.

Q. Was the gun loaded?

A. No.

Q. Did you and Patrolman Sion seize anything else from this individual?

A. Yes.

Q. What did you seize?

A. We seized a magazine containing 27 live rounds of ammunition.

Q. Okay. Did you at some point determine who the individual was that you arrested?

A. Yes.

Q. And who was the individual?

A. Albert Monteiro.

Q. How did you determine that's who it was?

A. I asked him when he was in the back of my police car.

Q. And after you arrested him and you seized the weapon and ammunition, what did you do?

A. After we seized the weapon, we brought him to central station for charging and booking.

Q. What did you do with the gun and ammunition specifically?

A. We turned it over to the BCI unit which handles all the evidence, and they fingerprint the gun and makes sure it works and stuff like that.

Q. What does BCI stand for?

A. Bureau of Criminal Investigation.

Q. Okay. Did anyone at the police department later determine that the individual that you arrested was Albert Monteiro?

A. I'm sure they did, yes.

MR. DONOVAN: Okay. I don't have any further questions for Patrolman Lafazia, but I open the floor to any of you that might have some questions for him.

GRAND JUROR: Patrolman, I had a question. You said you viewed the gun from the car?

THE WITNESS: Yes.

GRAND JUROR: But then you also said after you pulled in front of the suspect that you said to your partner, "He has a gun."

THE WITNESS: Correct.

GRAND JUROR: So your partner didn't know he had a gun?

THE WITNESS: Well, I was just making sure he knew that was definitely a gun, because you could actually -- you could see. It looked like -- it's so big. In your mind, you don't want to really realize it's a gun because it's so big and people don't carry those guns around. So we noticed -- it appeared to be a gun, so I dropped him off and I went around and I was like well, "That is a gun."

GRAND JUROR: How big is it?

THE WITNESS: It's about like this (witness gesturing.) It has like -- they call it a flash supression on the front where the barrel is. The barrel's about this long and there's a cover that goes over the barrel that has all holes in it like you see in the movies, and there's a handle in the back and then the magazine sticks out like that.

GRAND JUROR: So it's pretty visible?

THE WITNESS: Oh, yeah. You can't conceal it. It would be pretty hard to.

GRAND JUROR: I didn't hear what time of day it was.

THE WITNESS: 10:30 at night.

GRAND JUROR: How was the lighting?

THE WITNESS: It's okay. I had the alley light on the car. They're big spotlights.

GRAND JUROR: When you were driving by the suspect, where was he standing as opposed to where you were driving?

THE WITNESS: He was on the sidewalk.

GRAND JUROR: He was on the sidewalk?

THE WITNESS: Yeah. The street's here and there's a parking lot right there. He was making the corner into the parking lot, so he was pretty much on the street -- I mean, on the sidewalk. Usually, when you drive by somebody, they actually look to see who it is. He didn't.

GRAND JUROR: Did he attempt to take off when he knew you were going to stop him?

THE WITNESS: It looked like he was going to.

GRAND JUROR: Did he try to resist arrest?

THE WITNESS: No, no.

GRAND JUROR: I have two questions. Certainly, I have heard concern that he had possession of a firearm, but I haven't heard unlawful, where the unlawful is from. And also I have a question as to the certainty of his identity.

Given that he didn't try to run, I want to be certain that, indeed, we're considering the right person and that, indeed, the possession was unlawful.

MS. DONOVAN: I can answer part of that for you just to allay your concerns. One of the things that you need to determine -- whether there was unlawful possession of the firearm -- will be brought to your attention through the introduction of the testimony of the other witness that we have waiting.

And then just so you -- and I probably should have, since this is your first time, addressed this in the beginning. When the United States is done presenting all the evidence that it has, I will read for you what the exact charge is, and then I'll read for you all the legal instructions that you need to evaluate against the evidence to determine if there is probable cause to indict this particular individual. So I think that addresses part of what you might have been concerned about I hope.

But the question about the identity, do you have any more specific questions for Officer Lafazia about what he testified about on that issue?

GRAND JUROR: Well, that I heard simply that it was a verbal identification; he identified himself. Is there any other form of identification

we conclude.

(Whereupon, the witness was excused at 9:48 a.m)

(Whereupon, the witness was re-called at 10:10 a.m.)

THE FOREPERSON: I'd like to remind you, you are still covered under your original oath.

MS. DONOVAN: Officer Lafazia, I believe that one of the grand jurors has a question for you.

THE WITNESS: Okay.

GRAND JUROR: We know that the gentleman that you approached that day was fingerprinted and that a BCI check was done, and that, for me, is sufficient identification because it did show his name as a felon previously convicted.

THE WITNESS: Okay.

GRAND JUROR: That addressed my concern regarding his identification. I have another concern regarding possession of the firearm, given that you admit that you have guns of this kind and you are familiar with this firearm and you were the person who approached the -- this offender -- alleged offender -- and identified the possession of this particular gun on him. You also say that you turned the gun in to be properly run through the lab system

that you use.

THE WITNESS: Yes.

GRAND JUROR: When it went through the lab system, was the gun fingerprinted and did the fingerprints match the person who is the alleged offender?

THE WITNESS: I have no idea. That I don't know. I don't know that.

MS. DONOVAN: Can I ask the officer a follow-up question?

GRAND JUROR: Sure.

MS. DONOVAN: Officer Lafazia, did you know Albert Monteiro before this particular evening?

THE WITNESS: No, I did not.

GRAND JUROR: Did you ask him where he got the gun or what he was doing with the gun?

THE WITNESS: I don't recall if I did or not, actually. I don't remember.

GRAND JUROR: It seems to me when you're arresting somebody that would be one of the first questions.

THE WITNESS: I'm sure I did, but I don't want to lead you falsely if I did or I didn't. I assume I did.

MS. DONOVAN: Any other questions?

GRAND JUROR: I'll ask you after, I guess.

MS. DONOVAN: Okay. He'll still be outside.

(Whereupon, the witness was excused 10:12 a.m.)

(Whereupon, the witness was recalled at 10:18 a.m.)

THE FOREPERSON: Again, I would like to remind you that you are still covered under your original oath.

MS. DONOVAN: You might be the best person to ask the question, since it's your concern. So do you want to pose the question to him or would you like me to do it?

GRAND JUROR: I will ask, if that's okay.

MS. DONOVAN: Oh, no, that's okay.

GRAND JUROR: In the Providence Police Department and in your experience, how common is it using the lab that you use to do your research on the weapons that you have taken from crimes, how common is it for a semiautomatic weapon that has been taken with 27 out of 30 rounds from a previously convicted felon not fingerprinted, and how often would that information not be made available to you?

MS. DONOVAN: One thing before he answers

the question. I believe his testimony was that he didn't know whether, in fact, it had been fingerprinted; is that correct?

THE WITNESS: Right.

MS. DONOVAN: So your question -- just assume that we're talking about a scenario, that this particular gun or a gun that you have described in that situation was not fingerprinted.

GRAND JUROR: Not fingerprinted.

MS. DONOVAN: Right. Okay.

GRAND JUROR: Or that the -- or that he would not know if that would be the case.

MS. DONOVAN: Okay.

THE WITNESS: All right. As a scenario, generally, when you get somebody with a gun that's on him, you don't have -- in my experience, it's my understanding and I've been there five years, and guns are not -- you don't get guns every week. When you get someone with a gun on his person, it's generally possession. You really don't have to fingerprint it. I don't see why you would have to fingerprint it if he has it in his possession and, generally, you don't get fingerprints off guns. Generally.

GRAND JUROR: The rounds?

THE WITNESS: The rounds generally not because -- I'm not an expert at this, by no means, but when you put the rounds in the magazine, you push it down with your thumb or whatever, or you could use a mechanism, and when it rolls over, it hits everything else in the gun. It rolls over against another bullet, so you're really not going to get a fingerprint off it, from what I'm told.

And then the grips are -- they're checkered, so they're not really smooth. There's only certain parts of a gun you're going to get fingerprints off, from what I'm told, and those are generally not the parts that people touch. People touch a hand grip, you know, and then when they grab the slide from a semiautomatic, that part is checkered also, so you can get a grip on it.

GRAND JUROR: To your knowledge then, they are generally not fingerprinted?

MS. DONOVAN: What types of guns?

GRAND JUROR: A gun in this type of a scenario generally would not be fingerprinted; is that true?

THE WITNESS: I couldn't actually tell you that. I don't know.

GRAND JUROR: I just have one question.

MS. DONOVAN: Okay, go ahead.

GRAND JUROR: Could you describe for me one more time the arrest; how you drove by, what you saw? Could you do that for me just one more time?

THE WITNESS: Sure. We were driving up the street. We pulled on the side of somebody that he's dressed all in black. He's in the corner of a parking lot. He's on the sidewalk, but there's a parking lot right -- it's right there. As we drive by it, you can tell that he has something, a bulge in his jacket.

So we pull up a little more and I put my alley light on, and he's still not looking at us. Usually, if you shine a flashlight or something, they look at you but he didn't look at us. You could tell it was -- it looked like a weapon, so my partner jumped out of the car and I went around to cut him off, assuming there was going to be a foot chase, and I got out of the car and I noticed it definitely was a gun and I yelled to my partner, "He has a gun."

GRAND JUROR: Who reached Mr. -- is it Monteiro --

MS. DONOVAN: Uh-hum.

GRAND JUROR: -- first, was it you or your partner?

THE WITNESS: I believe we got there about the same time, because my partner assumed it was a gun. I'm assuming. I can't tell you what he was thinking, but I'm assuming with the training that we get, you know, you don't want to get in a vulnerable position, you know, and get shot. So there's a lot of cover around. And what I'm thinking is, I'm drawing cover away from my partner because he's looking at the car, because usually cars aren't doubled in the city. There's only a few of us that are doubled.

GRAND JUROR: So you drove up in front of Mr. Monteiro?

THE WITNESS: Yes.

GRAND JUROR: Your partner has jumped out?

THE WITNESS: Yes. He was behind me.

GRAND JUROR: You were in front of him with your car?

THE WITNESS: Yes.

GRAND JUROR: And then you exited your car?

THE WITNESS: Yup.

GRAND JUROR: And then you proceeded to --

THE WITNESS: Yes, I went around my car and --

GRAND JUROR: Went to the suspect?

didn't recognize him.

MS.. DONOVAN: Officer Lafazia, after you -- once you seize evidence from a person, do you have any responsibility for it once you turn it over to the Bureau of Criminal Identification for processing?

THE WITNESS: No.

MS. DONOVAN: Anybody else?

GRAND JUROR: This individual, did he belong in that area?

THE WITNESS: I don't believe so. I don't believe he did, no. I don't remember.

GRAND JUROR: Did you question him on that?

THE WITNESS: Yeah, I believe I did. I think he lived in the north end, if I'm not mistaken.

MS. DONOVAN: When you say the north end, what do you mean?

THE WITNESS: The north end of Providence.

MS. DONOVAN: And where is Lockwood?

THE WITNESS: The south side.

MS. DONOVAN: Anything else? Okay.

(Whereupon, the witness was excused at 10:26 a.m.)

C E R T I F I C A T E

I, Diane J. DeStefano, hereby certify that the forgoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

Nov 11, 2003
Date

Diane J. DeStefano, RPR
Diane J. DeStefano
Registered Professional Reporter